IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>KEVIN M. SULLIVAN | Criminal Action No.<br><br>1:15-CR-290-MHC-CMS |

### Government's Sentencing Memorandum

The United States of America, by John A. Horn, United States Attorney, and Paul R. Jones and Erin Sanders, Assistant United States Attorneys for the Northern District of Georgia, files this Government's Sentencing Memorandum. For the reasons outlined below, the Government recommends that the Court impose a below-guidelines custodial sentence of 87 months, to be followed by a term of supervised release of 10 years.

**A. The guidelines are properly calculated.**

The Presentence Investigation Report ("PSR") determined that the base offense level under USSG §2G2.2 was 22. (PSR ¶ 24.) Because the Defendant was convicted of receiving child pornography, his base offense level was reduced by 2 levels. (PSR ¶ 25.) The Defendant's child pornography collection included images of children under the age of 12 years, which led to an increase of 2 levels. (PSR ¶ 26.) Further, because his collection contained sadistic images of the sexual abuse of young children, 4 levels were added. (PSR ¶ 27.) The use of a computer to commit this offense resulted in an enhancement of 2 levels. (PSR ¶ 29.) His

collection contained more than 11,000 files of child sexual abuse, which resulted in an addition of 5 levels. (PSR ¶ 30.) The Defendant received a reduction of 3 levels for acceptance of responsibility. (PSR ¶¶ 36-37.) His total offense level is 30. (PSR ¶ 38.) He is in criminal history category I. (PSR ¶ 42.) His custody guidelines range is 97-121 months. (PSR p.16.) The Defendant is subject to a mandatory minimum sentence of five years in custody.

## B. The Defendant's assertions notwithstanding, the guidelines are not fatally flawed.

The Defendant devotes a considerable amount of his Sentencing Memorandum to attacking USSG §2G2.2 and its "irrational enhancements." (Doc. 69.) One court has confronted head-on this typical defense argument disparaging the guidelines and found the defense assault on the guidelines wanting.

Specifically, the court in *United States v. Cunningham*, 680 F. Supp.2d 844 (N.D. Oh. 2010), scrutinized defense attacks on the guidelines and found them failing in many respects.

> There is no dispute that certain enhancements apply in nearly every child pornography case. The 2–level enhancement for use of a computer applies in 96.5% of cases. The 2–level enhancement for images involving a prepubescent child applies in 95.5% of cases. The enhancement for possessing sadistic or masochistic images applies in over 60% of cases. Based on the frequency of the application of these enhancements, Cunningham seems to contend that his sentence should be lower. This argument suffers from several fatal flaws.

Initially, the Court notes that the frequency of the enhancements was expressly acknowledged by the Commission when it set the base offense levels for these offenses. The Commission was clear that it took into account the frequent use of these enhancements when it set the base offense levels. For example, the base offense level herein is 22 and results in a sentencing range of 41 to 51 months, or 9 to 19 months below the mandatory minimum. The bottom of the Guideline range remains below the mandatory minimum until a 4–level increase to offense level 26, resulting in a 63 to 78 month range. Applying the two most common enhancements, the use of a computer and possession of images of prepubescent children, generates a level 26 offense. In other words, once the two most common enhancements are applied, offenders effectively start off at the mandatory minimum. If the Court factors in acceptance of responsibility, an additional 3–level enhancement could occur, followed by the deduction for acceptance of responsibility, and the Guideline range would remain near the mandatory minimum. In other words, the Court could find that seven levels of enhancement are appropriate, yet still be in position to sentence an offender to the mandatory minimum with only a 3–month variance. The Court, therefore, affords little weight to the fact that some enhancements apply in nearly every instance. It is clear that the Guidelines have taken this factor into account.

....

Finally, the entirety of this argument is somewhat confusing to the Court. The fact that certain enhancements apply on a frequent basis does not serve as a basis for negating the Guidelines. If anything, the fact that more than fifty percent of offenders have over 300 images and that over sixty-percent have sadistic and masochistic images supports a conclusion that even more harsh sentences are required for deterrence.

The assertion that sentences should be reduced because it is easy to accumulate a large number of pictures quickly also rings hollow. The Court does not dispute that it is very likely that a defendant could acquire more than 600 images with just a few mouse clicks and several emails. But that number of images is not collected by accident. Instead, those images

> are sought out by a troubled mind, from like-minded individuals. Thus, a defendant makes a cognitive choice to seek out that level of images. Moreover, the Court has never before seen an argument that because a crime is easy to commit, it should be punished less severely. Robbery is certainly simplified from the criminal's perspective by the use of a firearm and the choice of a feeble, elderly victim. The Guidelines, however, do not lessen punishment because the crime was easier to commit. In fact, seeking out a vulnerable victim leads to a 2–level enhancement under the Guidelines. U.S.S.G. § 3A1.1(b)(1). This Court, therefore, will not alter its sentence simply because accessing and growing a database of child pornography has become easier as technology has advanced.

*Id.* at 851-53.

The analysis of the *Cunningham* court fairly disposes of the criticisms of the 2G2.2 guideline. Even so, the *Cunningham* court did not simply react by imposing a guideline sentence, but instead looked carefully at the defendant's conduct, including reviewing the images at issue. The *Cunningham* court noted:

> Cunningham is correct that he is not the worst of the worst. Having reviewed the images and video at issue, the Court can state that Cunningham's collection is small, relative to other offenders. Moreover, a majority of Cunningham's images consisted solely of nude, prepubescent females. That is not to minimize the harm caused by the creation of these images, but Cunningham is correct that there is a continuum in child pornography, and those images that do not depict sadistic or masochistic conduct fall near the lower end of that continuum. Cunningham's request for the mandatory minimum, however, is not well taken.

After additional comments related to Cunningham's conduct, the Court imposed a custodial sentence of 121 months.

What is notable about the *Cunningham* opinion is its direct challenge to other district judges to refocus the analysis:

> The Court also notes that the focus of nearly every argument regarding the child pornography Guidelines is on the harm to the offender, rather than the harm to the victim. Given the type of crime at issue, that type of analysis is troubling.

*Id.* at 861.

The *Cunningham* court opined that "[w]ith a growing number of district judges finding that the Guidelines in this area are entitled to no deference, sentencing disparities are bound to grow exponentially." That was in 2010, and it seems that Judge Adams was accurate in his prediction. Indeed, in this this case, the Defendant's sentencing memorandum and attachments—exceeding 100 pages—make no mention of the victims affected by his crime.

**C.  A sentence of 87 months is reasonable under 18 U.S.C. § 3553(a).**

This Court is properly guided by the advisory sentencing guidelines, the factors set forth in 18 U.S.C. § 3553(a), and the policy statements in the Eleventh Circuit's *en banc* decision in *United States v. Irey*, 612 F.3d 1160 (11th Cir. 2010). The *Irey* court noted that "[c]hild sex crimes are among the most egregious and despicable of societal and criminal offenses. *Id.* at 1206. In fact, the Eleventh Circuit has found that sentences as high as 100 years are reasonable. *See United States v. Sarras*, 575 F.3d 1191, 1220-21 (11th Cir. 2009) (a sentence of 1,200 months was reasonable for a defendant convicted of production of child pornography).

5

### 1. Offense conduct and nature and seriousness of the offense

The harm caused by the Defendant's conduct cannot be overstated. The Eleventh Circuit has addressed the seriousness of this offense in numerous opinions. In *United States v. Pugh*, 515 F.3d 1179, 1195-96 (11th Cir. 2008), the court noted that the use of children in pornographic material is harmful to the "psychological, emotional, and mental health of the child." *Id.* at 1196. The receipt and possession of child pornography expands the harm done to the child: "Our concern is not confined to the immediate abuse of the children depicted in these images, but is also to enlargement of the market and the universe of this deviant conduct that, in turn, results in more exploitation and abuse of children." *United States v. Williams*, 444 F.3d 1286, 1290 (11th Cir. 2006).

Here, the Defendant was involved in downloading and possessing thousands of files depicting young girls being bound, raped, and sexually abused. The Eleventh Circuit has noted that "the receipt of child pornography, like its distribution, is an act 'in furtherance of abuse of children.'" *United States v. Marshall*, 416 F. App'x 824, 829 (11th Cir. 2011). In support of his request for a sentence of 60 months (the minimum amount of custodial time required by law), the Defendant has marshaled a considerable number of persons to attest to his character. The one salient aspect of his character that is ignored is that the Defendant is a pedophile who perversely derives sexual pleasure from the abuse of children. To truly understand this aspect of the Defendant's character and the seriousness of the harm of his crime, we need only to listen to the voices of some

of those children whose images were among the Defendant's vast collection. As one girl wrote,

> Knowing people are watching what happened gives me a mix of anxiety, sadness, anger, and it disgusts me. If they see a video of me, they know everything that went on. It doesn't help with my fear at all. If it wasn't out there, I wouldn't be as fearful as I am now.
>
> It scares me. I'm definitely afraid of running across someone who has seen them and recognizes me. I know for sure I'll run into people who have seen them. It gives me a more likely chance I'm going to run into someone and get raped and stuff because someone recognizes me….
>
> I'm always in the midst of someone who has seen the videos. Like in this town. I feel self-conscious. It freaks me out and makes me want to hide myself…. Even the thought of it makes me just want to stay inside and not come out and see the outside world.
>
> I feel terrible about being a part of it….

Another victim writes,

> I worry that the people he sent my pictures to will come after me and try to do the same things to me again. I worry that the pictures of me and what he did have been passed on and on and on to many other pedophiles and any one of them or more could be in my neighborhood or at the store I go to anywhere around me.
>
> I am afraid that someone from the police will call and tell me that they found more pictures on other people's computers…. If you are looking at pictures or videos of me, or any other child for that matter, then you are hurting everyone you look at. Anyone who looks at those horrible pictures of me or other children are abusing us. Anyone who looks is keeping my pain going for the rest of my life. I cry at night because of this.

Dr. Sharon Cooper, a developmental and forensics pediatrician who examined the victims in the "Jan_Socks" series, noted that victims of child pornography are impacted physically, emotionally, and spiritually. She stated that studies show that, "[w]hen images are known to be in distribution, the pre-existing dysfunction caused by the initial abuse is typically worsened, since children remain at risk for further victimization by the ongoing downloading, trading and possession of their images."

By downloading all of these images for his perverse sexual enjoyment, the Defendant has actively contributed to the ongoing victimization of these children. With every download—with every viewing of every image and video—he has kept their wounds open and sore. He has made it difficult for the victims to put the sexual abuse behind them and to begin healing. If he ever even thought about what the effect of watching child pornography had on the victims, he might have convinced himself that he was not harming them, that the real harm was the original sexual abuse. Like many offenders, he might have even chosen to believe that the victims enjoyed being raped, tied up, and abused, as many deviant persons who derive enjoyment from child pornography think. In his sentencing memorandum, the defendant stated that "he deeply regrets his actions and the impact that the consequences of his conduct has had on his family, his friends and community, and his research." (Doc. 69, p. 2.) Noticeably absent from his list of "the consequences of his conduct" is the impact that his offense has had on the victims of the crime. No matter what he thought, he has expanded the harm that these victims have suffered. He has actively made it

8

difficult for them to recover and to reclaim their lives. The seriousness of his offense calls for a significant sentence.

### 2. History and characteristics of the Defendant

According to the PSR, the Defendant grew up in a middle class home. He was one of six children, and he did not suffer any abuse as a child. He does not suffer from any mental or emotional problems. He has not had any issues with drug addiction or alcoholism. He has a Ph.D. in epidemiologic science, and, prior to his arrest in this case, he worked as a professor at Emory University's Rollins School of Public Health.

On the surface, the Defendant would appear to be a highly successful person. And he would have remained one had it not been for his love of watching the sexual abuse of children. In his Sentencing Memorandum, the Defendant claims that he "has never engaged in any illicit, immoral, or illegal behavior with any other person, especially a minor." (Doc. 69-15.) That remains an unanswered question. Specifically, after agents executed the search warrant at the Defendant's office at Emory University, he asked if he was under arrest. When told that he was not, the Defendant left immediately and hurried home. Shortly afterwards, when agents arrived at his home, they found that he had completely wiped all of the contents of his home computer. (PSR ¶ 15.) What was on that computer that caused the Defendant to rush home to make sure that it could never be found? This Court will never know the answer. But it can rest assured that the Defendant was not destroying anything innocuous. In fact, if one thinks about what people keep on their home computers—digital photographs of

9

family and friends, vacations and holidays, going back many years; tax returns; legal and financial documents; e-mails and other important correspondence; and much more—the Defendant easily risked losing all of these documents forever just to make sure that law enforcement did not find what else he kept on that computer. In sum, it does not reflect well on his characteristics.

In support of his request for a sentence of 60 months, the Defendant has submitted a cursory letter from Dr. Javel Jackson, a psychologist whom he has been seeing for the previous 18 months. (Doc. 69-2.) Without staking out a firm position, Dr. Jackson seems to imply that the Defendant is not someone who has ever harmed a child. Again, because the Defendant successfully wiped all the contents from his home computer, if he had recorded abuse of a child and stored it on that computer, we will never know. At any rate, there is growing evidence that persons who only possess child pornography have higher contact offenses with children than previously believed. Recent research published in the JOURNAL OF SEXUAL AGGRESSION indicates why Congress' "meddling" in the Guidelines was justified:

> Crimes involving the possession, distribution, or manufacture of child pornography constitute violations of specific laws pertaining to the receipt and transmission of child abuse/exploitation images, and as a result there is a tendency for some individuals to assume these offenders are somehow distinct from child molesters (i.e., "hands-on" abusers). This assumption, in fact, is a key reason why recent years have seen an increase in judicial sentences that fall below sentencing guidelines (United States Sentencing Commission, 2012), a trend that may be attributable to an impression that the rate of "crossover" between child pornography collection and hands-on

abuse is low (Eke & Seto, 2011; Endrass et al., 2009; Seto, Hanson, & Babchishin, 2011).

The logic of this conceptual view is somewhat befuddling. It ignores the observation that individuals who molest children and those who download and masturbate to child pornographic images share a primary motivational pathway - both are sexually aroused by minors (Seto et al., 2006). It therefore should come as no surprise that offenders whose sexual fantasies and urges involve children are able to derive pleasure and gratify their deviant impulses through a variety of means, and it suggests that significant "crossover" may exist between these crimes.

Although some research (Elliott, Beech, Mandeville-Norden, & Hayes, 2009; Howitt & Sheldon, 2007; Webb, Craissati, & Keen, 2007) has shown differences between groups of "online" and "offline" offenders, most is limited by an important assumption; that is, an individual is a hands-off offender simply because official records do not reflect contact sexual offending. This assumption appears unwise, given the base rates for detecting sexual abuse are extraordinarily low, the finding that most victims of abuse never report their victimization to law enforcement, and the low percentage of arrests leading to convictions (Centers for Disease Control and Prevention, 2010; National Centre for Policy Analysis, 1999; US Department of Justice, 2010, 2012). Researchers should never assume an offender has not committed a hands-on crime merely because his or her criminal record does not reflect such a charge or conviction.

In an interesting study by Buschman et al. (2010), which unfortunately has a small sample size, data were collected from Dutch offenders who had downloaded child pornography. The researchers were able to ensure that disclosures would not be used against the offenders in court-immunity that obviously facilitated more complete honesty. Self-report and post-polygraph confessions were compared, and researchers found that while the majority of participants (21 of 25) initially denied any high-risk behaviours towards children in their self-report, following polygraph examination many offenders admitted they had engaged in such acts, and

five participants acknowledged they had a plan to sexually abuse children if the opportunity arose.[1]

This study goes on to describe its own processes as well as results. The study was comprised of 127 persons under investigation for the possession, receipt, or distribution of child pornography who agreed to take a polygraph examination regarding their hands-on activity.[2] These individuals had no known history of hands-on offending.[3] Six individuals (4.7%) admitted to sexually abusing at least one child prior to the polygraph.[4] However, during the polygraph procedures, an additional 67 individuals (52.8%) of the study sample provided disclosures about hands-on abuse they had perpetrated. That means a total of 57.7% of the sample admitting to previously undetected hands-on sexual offenses.[5] For children and judges, that is worse odds than a coin-toss. Even more shocking is the total number of hands-on victims for these 73 individuals: 282 children, nearly four per offender.[6]

This study is important because it supports the conclusions of prior studies, i.e., that child pornography offenders have high rates (as high as 85%) of previously unreported sexual offenses against children.[7] This should come as

---

[1] M.L. Bourke, et. al., "The use of tactical polygraph with sex offenders," *Journal of Sexual Aggression* (2014), 5-6.
[2] *Id*. at 8.
[3] *Id*.
[4] *Id*.
[5] *Id*.
[6] *Id*. at 9, Table I.
[7] Michael L. Bourke & Andres E. Hernandez, "The 'Butner Study' Redux: A Report on the Incidence of Hands-On Child Victimization by Child Pornography

little surprise—even the studies that relied only upon prior official reports (arrests or convictions) showed a 20-28% association between child pornography offenses and contact sex offenses.[8]

To the extent that the Defendant is trying to define his activity as being passive and removing the impossibility that he has ever harmed a child, research is not on his side.

---

Offenders," 24 J. FAM. VIOLENCE 183 (2009) (study of 155 federal child pornography offenders in the United States who participated in the residential sex offender treatment program at FCI Butner from 2002–05; finding that official records, including the offenders' presentence reports in their child pornography cases, revealed that 26% had previously committed a contact sex offense, yet finding that "self reports" of the offenders in therapy revealed that 85% had committed prior "hands on" sex offenses); *see also* United States Sentencing Commission "Report to Congress: Federal Child Pornography Offenses," (2012) Ch. 7, p. 173 ("The six self-report studies taken together reported a rate of 55 percent.").

[8] Janis Wolak et al., "Child Pornography Possessors: Trends in Offender and Case Characteristics," 23 SEXUAL ABUSE 22, 33–34 (2011) (finding, based on 2006 data from surveys of approximately 5,000 law enforcement officials throughout the United States, that 21% of cases that began with investigations of child pornography possession "detected offenders who had either committed concurrent sexual abuse [offenses] or been arrested in the past for such crimes"); Richard Wollert et al., "Federal Internet Child Pornography Offenders — Limited Offense Histories and Low Recidivism Rates," in THE SEX OFFENDER: CURRENT TRENDS IN POLICY & TREATMENT PRACTICE Vol. VII (Barbara K. Schwartz ed., 2012) (based on a study of 72 federal child pornography offenders in the United States who were treated by the authors during the past decade, the authors found that 20, or 28%, had prior convictions for a contact or non-contact sexual offense, including a prior child pornography offense).

**Conclusion**

For the foregoing reasons, the Government requests that the Court impose a sentence of 87 months in custody to be followed by a term of supervised release of 10 years. Such a sentence is reasonable under 18 U.S.C. § 3553(a).

Respectfully submitted,

JOHN A. HORN
   *United States Attorney*


/s/PAUL R. JONES
   *Assistant United States Attorney*
   Georgia Bar No. 402617
   Paul.Jones@usdoj.gov


/s/ERIN E. SANDERS
   *Assistant United States Attorney*
   Georgia Bar No. 552091
   Erin.Sanders@usdoj.com

600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181

## Certificate of Service

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

>Donald Samuel, Esq.
>Kristen W. Novay, Esq.
>Bruce S. Harvey, Esq.

February 27, 2017

>/s/ PAUL R. JONES
>PAUL R. JONES
>*Assistant United States Attorney*